AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Missouri

FILED

FEB 1 2 2020

U.S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST LOUIS

| In the Matter of the Search of | ) | |
|---|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.  4:20 MJ 5032 NAB |
| Precision Location Information; Subscriber & Transactional Records; Cell Site Information; Pen Register & Trap-and-Trace for Phone # (314) 477-9198 | ) ) ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ District of _____ Kansas _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21, USC Section 841, 846 | Conspiracy to possess with intent to distribute controlled substances. |

The application is based on these facts:

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Joe McKinney, Task Force Officer, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  ___02/12/2020___

_____
*Judge's signature*

City and state:  ___St. Louis, MO___

Nannette A. Baker, US Magistrate Judge
*Printed name and title*

SAUSA: NW

## **AFFIDAVIT**

I, Joe McKinney, your Affiant, am a Detective with the St. Charles County Police Department currently assigned as a Task Force Officer with the United States Drug Enforcement Administration (DEA) duly appointed according to law and acting as such.

### **Introduction**

1.      I am a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA), St. Louis Division, and have been since January 2017.  I am a sworn police officer since August 2005 and have served with the Ballwin Police Department.  During my time as a Ballwin Police Officer, I was detached to the St. Louis County Multi-Jurisdictional Drug Task Force.  Most currently, I am employed as a police officer by the St. Charles County Police Department.

2.      During my tenure with DEA, the St. Louis County Multi-Jurisdictional Drug Task Force and as a Task Force Officer, I have been assigned to investigative teams for numerous complex investigations of drug-trafficking organizations dealing in heroin, cocaine, marijuana, and other controlled substances.  These investigations have resulted in the seizure of heroin, methamphetamine, marijuana, other controlled substances, and weapons.  I am familiar with and have utilized normal methods of investigation, including, but not limited to, visual surveillance, electronic surveillance, questioning of witnesses, the use of search and arrest warrants, the use of informants, the use of pen registers, the utilization of confidential sources and the use of court-authorized wire intercepts.  My training with the Drug Enforcement Administration and as a sworn police officer has included specific training directly related to the aforementioned investigative techniques.

3.      The facts alleged in this affidavit come from my own investigation, my training and experience, and information obtained from other investigators and witnesses.  As this affidavit is

1

submitted for the limited purpose of establishing probable cause to locate and monitor the location of a cellular telephone as part of a criminal investigation, it does not set forth all of my knowledge regarding this matter.

4.      Upon information and belief, and as explained in greater detail below, the Sprint PCS telephone bearing number **(314) 477-9198**,  with an unknown scriber information being utilized by **Cornelius STALLINGS**, (hereinafter referred to as **"subject cellular telephone"**), which is being utilized by **Cornelius STALLINGS**, (hereinafter referred to as "STALLINGS"), has been used, and is presently being used, in connection with the commission of offenses involving ongoing violations of Title 21, United States Code, Sections 841(a)(1) and 846 (hereinafter referred to as the "subject offenses") by STALLINGS and others known and unknown.

5.      The present affidavit is being submitted in connection with an application of the Government for a warrant and order authorizing agents/officers of the investigative agency(ies), and other authorized federal/state/local law enforcement agencies, to obtain location information, including precision location information, cell site location information, and other signaling information, including pen register information, in an effort to locate and monitor the locations of **subject cellular telephone.**

6.      Your affiant further states that there is probable cause to believe that the location information associated with **subject cellular telephone** will lead to evidence of the **subject offenses** as well as to the identification of individuals who are engaged in the commission of those criminal offense and related crimes.

## Investigation and Probable Cause

7.     The source of your affiant's information and the grounds for his belief are as follows and based on your affiant's personal knowledge, and knowledge provided to your affiant by other officer(s) of the St. Charles County Regional Drug Task Force.

### February 4, 2020: Controlled Purchase of Methamphetamine

8.     On February 4, 2020, St. Charles County Regional Drug Task Force Detective Julie Jackson, acting in an undercover capacity, (hereinafter referred to as "J.J."), was in contact with Rainey GREGORY (hereinafter referred to as "GREGORY"), who was willing to sell J.J. a quantity of methamphetamine in exchange for $700.00 dollars. GREGORY told J.J. to meet him at the McDonalds restaurant located at 7300 N. Lindbergh Blvd, St. Louis MO 63042.  Prior to conducting the drug transaction, surveillance units located GREGORY at his residence and continued surveillance on him from his residence to the meet location at the McDonalds; with him not making any stops.  When J.J. arrived at the McDonalds, she observed GREGORY's vehicle, a blue Chevy Tracker, bearing Missouri License plate FN5B7D, already parked on the parking lot. J.J. parked her vehicle a couple of spots away from his vehicle.  J.J. advised she saw a female passenger, later identified as Grace PUCKETT (hereinafter referred to as "PUCKETT"), sitting in the passenger seat of GREGORY's vehicle with no one in the driver's seat.  J.J. called GREGORY's telephone and PUCKETT answered the telephone, who stated GREGORY went inside the restaurant and that when he comes back she (PUCKETT) would have him talk to J.J. J.J. observed GREGORY walk out of the restaurant and walk to his vehicle.  J.J. observed GREGORY looked at her and held up a finger and then got on telephone.  J.J. stated GREGORY called her and said, "It" referring to the methamphetamine, was going to be there in a minute.

9.     A short time later, J.J. stated she observed GREGORY get out of his vehicle and approach a silver Nissan Altima, bearing Missouri State License Plate EA5H1M (hereinafter

3

referred to as "the subject vehicle"). GREGORY then reentered his vehicle. The subject vehicle pulled up next to his vehicle. J.J. stated she observed GREGORY exit his vehicle and walk around to the passenger side of the subject vehicle. Afterwards, GREGORY walked back to his vehicle holding baggies with a substance in his left hand. GREGORY reentered his vehicle and a short time later, PUCKETT entered the passenger side of J.J.'s vehicle. PUCKETT provided J.J. with two baggies of methamphetamine and she provided PUCKETT with the agreed upon U.S. Currency. PUCKETT returned to GREGORY's vehicle and they left the area along with the Nissan Altima.

10.     A short time later, the subject vehicle, pulled up next J.J.'s vehicle and a black male, later identified as STALLINGS, exited the subject vehicle. STALLINGS waved to J.J. and she rolled down the passenger window. J.J. introduced herself to STALLINGS. STALLINGS asked if he could engage in narcotics transactions with J.J. directly, and she told him yes. STALLINGS asked if he could put his telephone number in J.J.'s telephone and she handed him her telephone. STALLINGS told J.J. that he could sell her a pound of methamphetamine for $4,200.00, which he said, comes out to around $275.00 dollars a "zip" (ounce). STALLINGS handed back J.J.'s telephone to her, which was dialing 636-597-9198, and went back to his vehicle to get his telephone. J.J. told STALLINGS that the number was not working, at which time, STALLINGS asked for J.J.'s number telling her he wanted to put it in his trap phone. J.J.'s telephone started ringing with the **subject cellular telephone** number appearing on her phone. J.J. confirmed with STALLINGS that the **subject cellular telephone** was him, and he said, "Yes". J.J. asked what STALLINGS name was and he replied, "Marco".

11.     STALLINGS inquired with J.J. about her relationship with GREGORY, and told her not to tell GREGORY that she was dealing with him directly. STALLINGS then asked J.J. if

4

she dealt with anything else and told her he could do "China", "X-pills" (from Detroit, Canada), and "fentanyl". STALLINGS told J.J. he was doing "raw" for $70.00 a gram and $1700.00 for an ounce. STALLINGS asked J.J. if "she could move a lot of shit" at which time she told him, "yes". The suspected methamphetamine was later field tested and tested positive for methamphetamine.

### February 7, 2020: Controlled Purchase of Methamphetamine

12.     On February 7, 2020, St. Charles County Regional Drug Task Force Detective Julie Jackson (J.J.), acting in an undercover capacity was in contact with STALLINGS on the **subject telephone number,** who agreed to sell J.J. three (3) ounces of methamphetamine in exchange for $900.00 U.S. Currency. J.J. made contact with STALLINGS on the **subject telephone number**. STALLINGS told J.J. to meet him at the White Castle restaurant, located at 5231 Jennings Station Road, St. Louis Missouri 63136. Due to a police presence at the meet location, J.J. called STALLINGS on the **subject telephone number,** who then directed her to the Phillips 66, located at 6150 Natural Bridge Ave, St. Louis Missouri 63120. A short time later, STALLINGS arrived at the meet location, driving the subject vehicle. As STALLINGS drove onto the lot, J.J. followed STALLIINGS to the area of Natural Bridge and Hamilton Avenue, at which time, STALLINGS pulled into a parking lot on the left side of the street. According to Google Maps, the lot address is 5943 Natural Bridge Ave, St. Louis MO 63120. STALLINGS exited his vehicle, opened J.J.'s passenger door, handed her a baggie with white crystals, and in return, J.J. handed STALLINGS the agreed upon U.S. Currency. The suspected methamphetamine was later field tested and tested positive for methamphetamine.

### February 10, 2020: Controlled Purchase of Fentanyl

13.     On February 10, 2020, J.J., acting in an undercover capacity was in contact with STALLINGS on the **subject telephone number**, who agreed to sell J.J. six (6) grams of fentanyl

in exchange for $400.00 U.S. Currency. J.J. made contact with STALLINGS on the **subject telephone number**. On February 7, 2020, during a conversation with STALLINGS, he told J.J. that his fentanyl would be getting in on February 8, 2020, at which time J.J. told STALLINGS to contact her once it came in. On February 10, 2020, J.J. contacted STALLINGS on the **subject telephone number** after not hearing from him. Upon making contact with STALLINGS, he informed J.J. that his guy should be getting it today and that he would call her around 4:00 PM. STALLINGS also told J.J. that his guy wanted $500.00 for 6 grams. STALLINGS and J.J. agreed to $425.00 and J.J. told STALLINGS she would call him when she is ready. After some back and forth calls, STALLINGS contacted J.J. using the **subject telephone number** and said he was ready to go. During the telephone call, STALLINGS directed J.J. to the McDonalds, located at 1119 North Tucker, St. Louis MO 63101. Upon arrival J.J. parked her vehicle on the parking lot and waited for STALLINGS to arrive. A short time later, STALLINGS arrived in the subject vehicle.

14.     J.J. followed STALLINGS to the area of 600 block of North Tenth Street. STALLINGS then exited his vehicle and entered the front passenger seat of J.J.'s vehicle. STALLINGS handed J.J. a baggie containing a white powder and she handed him $400.00 in U.S. Currency. J.J. informed STALLINGS, the bank would only let her get $400.00. The suspected fentanyl was later field tested and tested positive for fentanyl.

15.     I know from my training and experience that is common for drug traffickers to use fictitious names and to utilize multiple telephones to compartmentalize their communications between individuals in an attempt to insulate themselves from detection by law enforcement.

16.     The investigation to date, including the above information, illustrates that STALLINGS is utilizing **subject cellular telephone** to facilitate drug trafficking activities, including the distribution of methamphetamine and fentanyl within the Eastern District of

Missouri. The PLI would assist investigators in identifying co-conspirators, identifying possible locations where drugs and drug proceeds are stored, discovering assets purchased with drug proceeds, and methods used by members of the organization in conducting their illegal activities. This knowledge would assist law enforcement in collecting/seizing evidence of the **subject offenses**.

17.     Based on the investigation to date, your affiant states that there is probable cause to believe that **subject cellular telephone** is being used in connection with the commission of offenses involving ongoing violations of Title 21, United States Code, Section(s) 841(a)(1) and 846 (the **subject offenses**). It is critical that the investigative team be able to locate and monitor the movements of **subject cellular telephone** thereby assisting in the identification of the co-conspirators and the seizure of controlled substances. Your affiant believes that the requested authorization would be a valuable asset in achieving the overall goals of the investigation.

### Investigative Considerations and Techniques

18.     Based on my knowledge, training, and experience, as well as information provided by investigators with specialized experience relating to cellular telephone technology, I am aware of the following facts and considerations:

A.     Wireless phone providers typically generate and retain certain transactional information about the use of each telephone call, voicemail, and text message on their system. Such information can include log files and messaging logs showing all activity on a particular account, such as local and long distance telephone connection records, records of session times and durations, lists of all incoming and outgoing telephone numbers or other addressing information associated with particular telephone calls, voicemail messages, and text or multimedia messages.

7

B.     Wireless phone providers also typically generate and retain information about the location in which a particular communication was transmitted or received.  For example, when a cellular device is used to make or receive a call, text message or other communication, the wireless phone provider will typically generate and maintain a record of which cell tower(s) was/were used to process that contact.  Wireless providers maintain information, including the corresponding cell towers (i.e., tower covering specific geographic areas), sectors (i.e., faces of the towers), and other signaling data as part of their regularly conducted business activities.  Typically, wireless providers maintain records of the cell tower information associated with the beginning and end of a call.

C.     Because cellular devices generally attempt to communicate with the closest cell tower available, cell site location information from a wireless phone provider allows investigators to identify an approximate geographic location from which a communication with a particular cellular device originated or was received.

D.     Wireless providers may also retain text messaging logs that include specific information about text and multimedia messages sent or received from the account, such as the dates and times of the messages.  A provider may also retain information about which cellular handset or device was associated with the account when the messages were sent or received.  The provider could have this information because each cellular device has one or more unique identifiers embedded inside it.  Depending upon the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Station Equipment Identity ("IMEI"). When a cellular device connects to a cellular antenna or tower, it reveals its embedded unique identifiers

8

to the cellular antenna or tower in order to obtain service, and the cellular antenna or tower records those identifiers.

E.      Wireless providers also maintain business records and subscriber information for particular accounts.  This information could include the subscriber's full name and address, the address to which any equipment was shipped, the date on which the account was opened, the length of service, the types of service utilized, the ESN or other unique identifier for the cellular device associated with the account, the subscriber's Social Security Number and date of birth, all telephone numbers and other identifiers associated with the account, and a description of the services available to the account subscriber.  In addition, wireless providers typically generate and retain billing records for each account, which may show all billable calls (including outgoing digits dialed).  The providers may also have payment information for the account, including the dates and times of payments and the means and source of payment (including any credit card or bank account number).

F.      Providers of cellular telephone service also typically have technical capabilities that allow them to collect and generate more precise location information than that provided by cell site location records.  This information is sometimes referred to as E-911 Phase II data, GPS data or latitude-longitude data.  In the Eastern District of Missouri, such information is often referred to as "precision location information" or "PLI" data.  E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by attempting to triangulate the device's signal using data from several of the provider's cell towers.  Depending on the capabilities of the particular phone and provider, E-911 data can sometimes provide precise information related to the location of a cellular device.

9

G.     In order to locate **subject cellular telephone** and monitor the movements of the phones, the investigative agency(ies), and other authorized federal/state/local law enforcement agencies, may need to employ one or more techniques described in this affidavit and in the application of the government.     The investigative agency(ies), and other authorized federal/state/local law enforcement agencies, may seek a warrant to compel T-Mobile, Verizon, any telecommunication service providers reflected in Attachment 1, to include providers of any type of wire and/or electronic communications  (herein incorporated by reference), and any other applicable service providers, to provide precision location information, including Global Position System information (if available), transactional records, including cell site location information, and pen register and trap-and-trace data.

H.     None of the investigative techniques that may be employed as a result of the present application and affidavit require a physical intrusion into a private space or a physical trespass. Electronic surveillance techniques such as pen register and cell site location monitoring typically have not been limited to daytime use only.  Furthermore, the criminal conduct being investigated is not limited to the daytime.  Therefore, the fact that the present application requests a warrant based on probable cause should not limit the use of the requested investigative techniques to daytime use only.     Accordingly, the investigative agency(ies), and other authorized federal/state/local law enforcement agencies, request the ability to employ these investigative techniques at any time, day or night.

I.     The monitoring of the location of **subject cellular telephone** by one or more of the methods described herein will begin within ten (10) days of the date of issuance of the requested Warrant and Order.

## **CONCLUSION**

10

19.     Based on the above information, there is probable cause to believe that **subject cellular telephone** continue to be used to promote and facilitate a conspiracy to distribute controlled substances and the requested authorization would provide relevant evidence of the conspiracy.   There is likewise probable cause to conclude that locating and monitoring the movements of **subject cellular telephone** will lead to the relevant evidence concerning violations of Title 21, United States Code, Section(s) 841(a)(1) and 846.

20.     None of the investigative techniques that may be employed as a result of the present application and affidavit require a physical intrusion into a private space or a physical trespass. Electronic surveillance techniques such as pen register and cell site location monitoring typically have not been limited to daytime use only.  Furthermore, the criminal conduct being investigated is not limited to the daytime.  Therefore, the fact that the present application requests a warrant based on probable cause should not limit the use of the requested investigative techniques to daytime use only.   Accordingly, the investigative agency(ies), and other authorized federal/state/local law enforcement agencies, request the ability to employ these investigative techniques at any time, day or night.

21.     The monitoring of the location of the subject cellular telephone by one of the methods described herein will begin within ten (10) days of the date of issuance of the requested Warrant and Order.

2-12-2020
Date

Joe McKinney
Task Force Officer (TFO)
Drug Enforcement Administration

Sworn to and subscribed before me this _12TH_ day of February,  2020.

NANNETTE A. BAKER
United States Magistrate Judge
Eastern District of Missouri

11

# ATTACHMENT A

The United States has submitted an application pursuant to 18 U.S.C. §§ 2703(c)(1)(A) & B, (c)(2), and 3122 and Federal Rule of Criminal Procedure 41 requesting that the Court issue a Warrant and Order requiring a telecommunications service provider reflected in Part II of this Attachment A, to disclose the records and other information concerning the account described in Part I of this Attachment A.

## I.    The Account(s)

The Order applies to certain records and information associated with the following:

| Provider Name | Number or identifier | Owner, if known | Subject of investigation, if known |
|---|---|---|---|
| Sprint PCS | **(314) 477-9198** (the subject cellular telephone) | **UNKNOWN** | **Cornelius STALLINGS** and others known and unknown |

## II.    The Provider

Records and information associated with the subject cellular telephone that is within the possession, custody, or control of **Sprint PCS,** and other applicable service providers reflected on the list contained in this Attachment A, including information about the location of the subject cellular telephone if it is subsequently assigned a different call number.

1

## LIST OF TELECOMMUNICATION SERVICE PROVIDERS

| | | | |
|---|---|---|---|
| 01 Communications | Egyptian Telephone | Mid-Atlantic | Socket Telecom |
| Access Line Communication | Electric Lightwave, Inc. | Midvale Telephone Exchange | Spectrum |
| ACN, Inc. | Empire Paging | Mobile Communications | Sprint |
| ACS | Ernest Communications | Mound Bayou Telephone Co. | SRT Wireless |
| Aero Communications, Inc. (IL) | EZ Talk Communications | Mpower Communications | Star Telephone Company |
| Afford A Phone | FDN Communications | Navigator | Start Wireless |
| Airvoice Wireless | Fibernit Comm | Telecommunications | Sugar Land Telephone |
| Alaska Communications | Florida Cell Service | NE Nebraska Telephone | Sure West Telephone Company |
| Alhambra-Grantfx Telephone | Florida Digital Network | Netlink Comm | Talk America |
| Altice USA | Focal Communications | Network Services | Tele Touch Comm |
| AmeriTel | Frontier Communications | Neustar | Telecorp Comm |
| AOL Corp. | FuzeBox, Inc. | Neutral Tandem | Telepak |
| Arch Communication | Gabriel Comm | Nex-Tech Wireless | Telispire PCS |
| AT&T | Galaxy Paging | Nexus Communications | Telnet Worldwide |
| AT&T Mobility | Global Communications | NII Comm | Tex-Link Comm |
| Bell Aliant | Global Eyes Communications | North Central Telephone | Time Warner Cable |
| Big River Telephone | Global Naps | North State Comm | T-Mobile |
| Birch Telecom | Grafton Telephone Company | Northcoast Communications | Total Call International |
| Blackberry Corporation | Grand River | Novacom | Tracfone Wireless |
| Brivia Communications | Grande Comm | Ntera | Trinity International |
| Broadview Networks | Great Plains Telephone | NTS Communications | U-Mobile |
| Broadvox Ltd. | Harrisonville Telephone Co. | Oklahoma City SMSA | United Telephone of MO |
| Budget Prepay | Heartland Communications | ONE Communications | United Wireless |
| Bulls Eye Telecom | Hickory Telephone | ONSTAR | US Cellular |
| Call Wave | Huxley Communications | Optel Texas Telecom | US Communications |
| Cbeyond Inc. | iBasis | Orion Electronics | US LEC |
| CCPR Services | IDT Corporation | PacBell | US Link |
| Cellco Partnership, | Illinois Valley Cellular | PacWest Telecom | US West Communications |
| d/b/a Verizon Wireless | Insight Phone | PAETEC Communications | USA Mobility |
| Cellular One | Integra | Page Plus Communications | VarTec Telecommunications |
| Cellular South | Iowa Wireless | Page Mart, Inc. | Verisign |
| Centennial Communications | IQ Telecom | Page Net Paging | Verizon Telephone Company |
| CenturyLink | J2 Global Communications | Panhandle Telephone | Verizon Wireless |
| Charter Communications | Leap Wireless International | Peerless Network | Viaero Wireless |
| Chickasaw Telephone | Level 3 Communications | Pineland Telephone | Virgin Mobile |
| Choctaw Telephone Company | Locus Communications | PhoneTech | Vonage Holdings |
| Cimco Comm | Logix Communications | PhoneTel | Wabash Telephone |
| Cincinnati Bell | Longlines Wireless | Preferred Telephone | Wave2Wave Communications |
| Cinergy Communications | Los Angeles Cellular | Priority Communications | Weblink Wireless |
| Clear World Communication | Lunar Wireless | Puretalk | Western Wireless |
| Com-Cast Cable Comm. | Madison River | RCN Telecom | Westlink Communications |
| Commercial Communications | Communications | RNK Telecom | WhatsApp |
| Consolidated Communications | Madison/Macoupin Telephone | QWEST Communications | Windstream Communications |
| Cox Communications | Company | Sage Telecom | Wirefly |
| Cricket Wireless | Mankato Citizens Telephone | Seren Innovations | XFinity |
| Custer Telephone Cooperative | Map Mobile Comm | Shentel | XO Communications |
| DBS Communications | Marathon Comm | Sigecom LLC | Xspedius |
| Delta Communications | Mark Twain Rural | Sky Tel Paging | Yakdin Valley Telephone |
| Detroit Cellular | Max-Tel Communications | Smart Beep Paging | YMAX Communications |
| Dobson Cellular | Metro PCS | Smart City Telecom | Ztel Communications [1] |
| | Metro Teleconnect | | |

---

[1]  Last Update: 09/27/2019

1

## ATTACHMENT B

It is hereby ordered, pursuant to 18 U.S.C. §§ 2703(c)(1)(A) &(B), (c)(2) and 3123 and Federal Rule of Criminal Procedure 41, that the Provider(s) identified in Attachment A shall disclose to the United States the following:

**I.      PRECISION LOCATION INFORMATION**

**A.      Information to be Disclosed by the Provider**

All information for the following time period of forty-five days from the date of this Warrant and Order, that is for the time period from *February 12, 2020 to March 26, 2020*, 11:59 p.m. (CT) during all times of day and night, regarding the location of the subject cellular telephone described in Attachment A.

"Information about the location of the subject cellular telephone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precision location information, as well as all data about which "cell towers" (*i.e.*, antenna towers covering specific geographic areas) and "sectors" (*i.e.*, faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location Information to the investigative agency(ies).

**B.      Information to Be Seized by the United States**

All information described above in Part I, Section A that constitutes evidence of violations of Title 21, United States Code, Sections 841(a)(1) and 846 by **Cornelius STALLINGS** and others known and unknown.

## II.     CELL TOWER RECORDS AND OTHER TELECOMMUNICATION DATA

For the subject cellular telephone identified in Attachment A, the following telecommunication records and information, but not the contents of any communication for the past thirty (30) days from the date of this Warrant and Order and at reasonable intervals for up to forty-five (45) days from the date of this Warrant and Order, the following:

**Information to be Disclosed by the Provider**

1.     All available names, addresses, and identifying information, and other subscriber and service feature information and types of service utilized;

2.     Length of service;

3.     All telephone numbers, Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), an International Mobile Subscriber Identifier ("IMSI"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), or an International Mobile Station Equipment Identity ("IMEI")  numbers, including any and all customer service records, credit and billing records, can-be-reached numbers (CBR), enhanced custom calling features, and primary long-distance carrier;

4.     Subscriber information available for any originating telephone number;

5.     Automated Messaging Accounting (AMA) records (a carrier billing mechanism data base search which provides records of originating and terminating caller information for calls to the subject cellular telephone) for the above-specified time period;

6.     Means and source of payment for services, including any credit card or bank account number, and air-time summaries for available service periods, for the IP (internet protocol) addresses being utilized by and signaled to and from the aforementioned subject cellular telephone;

7.      Cellular telephone records and information pertaining to the following, for the above-specified time period:

(a)      call detail information (provided in an electronic format specified by the agents/officers of the investigative agency(ies), and other authorized federal/state/local law enforcement agencies);

(b)      cell site activation information, including information identifying the antenna tower receiving transmissions from the subject cellular telephone number, and any information on what portion of that tower is receiving a transmission from the subject cellular telephone number, at the beginning and end of a particular telephone call made to or received by the subject cellular telephone number;

(c)      numbers dialed;

(d)      call duration;

(e)      incoming numbers if identified;

(f)      signaling information pertaining to that number;

(g)      a listing of all control channels and their corresponding cell sites;

(h)      an engineering map showing all cell site tower locations, sectors and orientations;

(i)      subscriber information, including the names, addresses, credit and billing information, published and non-published for the telephone numbers being dialed from the subject cellular telephone;

(j)      historical location estimates, such as Network Event Location System (NELOS), round-trip time (RTT), GPS, and per-call measurement data (PCMD); and,

(k)     Internet Protocol (IP addresses) utilized by and signaled to and from the subject cellular telephone.

## III.   PEN REGISTERS AND TRAP AND TRACE DEVICES

For the subject cellular telephone identified in Attachment A for a period of forty-five (45) days from the date of this Warrant and Order, the following:

1.      Pursuant to Title 18, United States Code, Section 3123, pen register and trap and trace devices, including enhanced caller identification, may be installed by the investigative agency(ies) and used to record or decode dialing, routing, addressing, or signaling information, and to capture the incoming electronic or other impulses, which identify the originating number or other dialing, routing, addressing and signaling information reasonably likely to identify the source of a wire or electronic communication to and from the subject cellular telephone number, including the direct connect, Voice-over-LTE (VoLTE), non-content data transmissions, or digital dispatch dialings (if applicable), the dates and times of such dialings, and the length of time of the connections, pertaining to the subject cellular telephone described in Attachment A., including the date, time, and duration of the communication, and the following, without geographic limit, including:

a.   IP addresses associated with the cell phone device or devices used to send or receive electronic communications;

b.   Any unique identifiers associated with the cell phone device or devices used to make and receive calls with cell phone number described in Attachment A, or to send or receive other electronic communications, including the ESN, MEIN, IMSI, IMEI, SIM, MSISDN, or MIN;

      c.   IP addresses of any websites or other servers to which the subject cellular telephone connected;

      d.   Source and destination telephone numbers and email addresses;

      e.   "Post-cut-through dialed digits," which are digits dialed after the initial call set up is completed, subject to the limitations of 18 U.S.C. § 3121(c).

2.     The Provider, and/or any telecommunications service providers reflected in Attachment A, to include providers of any type of wire and/or electronic communications, and any other applicable service providers, shall initiate caller identification on the subject cellular telephone identified in Attachment A, without the knowledge of or notification to the subscriber, for the purpose of registering incoming telephone numbers

3.     The Providers reflected in Attachment A, to include providers of any type of wire and/or electronic communications, and any other applicable service providers, shall furnish the agents/officers of the investigative agency(ies), and other authorized federal/state/local law enforcement agencies, forthwith all information, facilities, and technical assistance necessary to accomplish the installation and use of the pen register and trap and trace devices, including enhanced caller identification, unobtrusively and with minimum interference to the services that are accorded persons with respect to whom the installation and use is to take place.

4.     The Providers reflected in Attachment A, to include providers of any type of wire and/or electronic communications, and any other applicable telecommunications service providers, shall provide the agents/officers of the investigative agency(ies), and other authorized federal/state/local law enforcement agencies, with the results of the pen register and trap and trace devices, including enhanced caller identification, at reasonable intervals for the duration of this Warrant and Order.

5.      Should the subject cellular telephone identified in Attachment A and/or ESN, MIN, IMEI, MSID or IMSI number listed above be changed by the subscriber during the effective period of this Order, the request for pen register and trap and trace devices, including enhanced caller identification, shall remain in effect for any new telephone to which the subject cellular telephone listed above is changed throughout the effective period of these Warrants and Orders.

6.      ·The Providers reflected in Attachment A, to include providers of any type of wire and/or electronic communications, and any other applicable service providers, shall be provided compensation by the lead investigative agency for reasonable expenses incurred in providing technical assistance.

7.      Pursuant to Title 18, United States Code, Sections 3123(d)(1) and (2), the Provider, and the service providers reflected in Attachment A, to include providers of any type of wire and/or electronic communications, and any other applicable service providers, shall not disclose the existence of this application and/or any warrant or order issued upon this application, or the existence of the investigation, for a period of one year from the date of this Order to a subscriber or lessee or to any other person, except that the provider may disclose the warrant to an attorney for the provider for the purpose of receiving legal advice.

This Warrant and Order does not authorize interception of any communications as defined in Title 18, United States Code, Section 2510(4), but authorizes only the disclosure of signaling information, including cell site information, precision location information, including GPS information, related to the subject cellular telephone.

The investigative agency(ies), and other authorized federal/state/local law enforcement agencies, to whom this Warrant and Order is directed will begin monitoring the location of the

subject cellular telephone by one of the methods described in this Warrant within ten (10) days of the date of this Warrant and Order.